## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| DAMITA KENNEDY, | CASE NO. 3:22-CV-01513-JRK |
| Plaintiff, | JUDGE JAMES R. KNEPP II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT & RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Damita Kennedy challenges the decision of the Commissioner of Social Security denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 25, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Aug. 25, 2022). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Kennedy filed for DIB on August 21, 2018, alleging a disability onset date of January 1, 2007. (Tr. 745). Her claims were denied initially and on reconsideration. (Tr. 618, 637). She then requested a hearing before an Administrative Law Judge. (Tr. 652-53). Ms. Kennedy (represented by counsel) and a vocational expert (VE) testified at a hearing before the ALJ on

1

January 26, 2021. (Tr. 570-97). On March 10, 2021, the ALJ issued a written decision finding Ms.

Kennedy not disabled. (Tr. 9-34). On July 1, 2022, the Appeals Council denied Ms. Kennedy's

request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-8;

*see* 20 C.F.R. §§ 404.955, 404.981). Ms. Kennedy timely filed this action on August 25, 2022.

(ECF #1).

FACTUAL BACKGROUND

## I.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Kennedy was 39 years old on the alleged onset date, and 61 years old at the most

recent administrative hearing. (Tr. 745). She completed high school (Tr. 577) and previously

worked at a gas station (Tr. 578).

## II.    RELEVANT MEDICAL EVIDENCE[1]

Angela Brittsan, M.D., originally diagnosed Ms. Kennedy with rheumatoid arthritis and

chest pain on October 25, 2007. (Tr. 1738). Vivian P. Hobayan, M.D., examined Ms. Kennedy

and diagnosed chronic headaches, history of rheumatoid arthritis, fibromyalgia, bilateral

subacromial bursitis, and bilateral trochanteric bursitis on May 5, 2016. (Tr. 1204-05). A May 17,

2016 X-ray of her lumbar spine revealed spondylolisthesis (grade 1) at L4-L5. (Tr. 1219).

At a March 13, 2017 follow up with Dr. Hobayan, Ms. Kennedy presented with

inflammatory polyarticular arthritis, fibromyalgia, and bilateral trochanteric bursitis. (Tr. 1196).

Deanna Merrill, PA-C, diagnosed Ms. Kennedy with myalgia on March 27, 2017. (Tr. 1168).

---

[1]    Ms. Kennedy challenges the ALJ's failure to adopt standing, walking, and range of motion limitations as opined by Dr. Onamusi; therefore, I limit my discussion of medical evidence to that relating to her challenges.

Pallavy Reddy, M.D., examined Ms. Kennedy on September 26, 2017, and confirmed myalgia. (Tr. 1160). On January 25, 2018, Dr. Hobayan examined Ms. Kennedy at a follow up appointment, finding inflammatory polyarticular arthritis, stable fibromyalgia, bilateral trochanteric bursitis, chronic back pain syndrome, and chronic headaches. (Tr. 1192).

Jason Stienecker, D.O., assessed Ms. Kennedy with shortness of breath and shift work sleep disorder on May 16 and August 15, 2018. (Tr. 1118, 1131). On September 26, 2018, Monica Loke, M.D., diagnosed Ms. Kennedy with spondylolisthesis in the lumbar region, pain of cervical facet joint, carpal tunnel syndrome of left wrist, low back pain, and other chronic pain. (Tr. 1175). At a follow-up appointment with Dr. Hobayan on October 8, 2018, Ms. Kennedy again exhibited inflammatory polyarticular arthritis and fibromyalgia. (Tr. 1182). On October 16, 2018, William Hogan Jr., M.D., agreed Ms. Kennedy exhibited lumbar spondylosis and recommended physical therapy. (Tr. 1385).

On January 4, 2019, Ms. Kennedy attended physical therapy with Sandra Huffman, P.T. (Tr. 1408). Ms. Kennedy described her lower back pain as a 7 out of 10. (*Id.*). P.T. Huffman found a moderate limitation in Ms. Kennedy's walking, commenting she struggles with walking endurance because she runs out of breath quickly. (*Id.*). P.T. Huffman also noted Ms. Kennedy's "obvious weakness and tightness thru out [her] hip, ankle, and lower back." (Tr. 1409). Ms. Kennedy described tingling and shooting pain in her legs to P.T. Huffman on January 10, 2019. (Tr. 1412). Dr. Hobayan assessed Ms. Kennedy with seronegative rheumatoid arthritis, fibromyalgia, degenerative joint disease of the lumbar spine, bilateral subacromial bursitis, and myofascial pain of the cervical, thoracic, and lumbar regions on April 9, 2019. (Tr. 1423).

James Edwards, P.T., saw Ms. Kennedy on July 2, 2019. P.T. Edwards noted impairments of decreased endurance, decreased flexibility, generalized pain with resistance testing, and decreased range of motion. (Tr. 1516). P.T. Huffman indicated at a visit on July 30, 2019 "multiple musculoskeletal issues from head to toe, weakness and much tightness thru out pt's hip, ankle, lower back, neck, and shoulders." (Tr. 1852).

Alex Chan, M.D., reviewed an MRI of Ms. Kennedy's lumbar spine without contrast on October 22, 2019. Dr. Chan's impression included mild central canal stenosis at L4-L5, mild degenerative anterolisthesis of L4 on L5, and moderate pronounced right and left degenerative facet arthropathy. (Tr. 1878).

III.   MEDICAL OPINIONS

At the initial determination level, State agency consultant Michael Hallet, M.D., found Ms. Kennedy could perform work at the light exertional level and could lift and/or carry 20 pounds occasionally and ten pounds frequently; stand and/or walk for about six hours and sit for about six hours in an eight-hour workday with normal breaks; frequently crouch; and occasionally climb ladders, ropes, or scaffolds and stoop, kneel, and crawl. (Tr. 613-14).

In a medical source statement dated January 16, 2019, Gerald Riess, M.D., opined Ms. Kennedy could not lift or carry one to five pounds. (Tr. 1394). Dr. Riess also opined Ms. Kennedy could never reach with her left or right arm. (*Id.*). He found Ms. Kennedy could stand, walk, and sit for less than one hour during an eight-hour workday, and could stand and walk for ten minutes at a time. (Tr. 1395). Dr. Riess opined Ms. Kennedy could sit for 30 minutes at a time. (*Id.*). Dr. Riess also found Ms. Kennedy could not bend, crouch/squat, crawl, climb steps, or climb ladders at all. (*Id.*). He noted these conditions have existed and persisted since at least 2016. (Tr. 1396).

4

Dr. Riess opined Ms. Kennedy would likely have partial or full day unscheduled absences from work occurring five or more days per month due to the diagnosed conditions, pain, and/or side effects of medication. (*Id.*). Dr. Riess stated his assessment was based on Ms. Kennedy's symptoms of atypical head pain making it impossible to do normal activities. (*Id.*).

On April 11, 2019, Ms. Kennedy attended a consultative examination with B.T. Onamusi, M.D. (Tr. 1367-74). She reported her medication regimen included an antihypotensive, Losartan; a calcium channel blocker, Amlodipine; a diuretic, Furosemide; an anticonvulsant, Oxcarbazepine; a muscle relaxer, Baclofen; a chemotherapy agent and immune system suppressant, Methotrexate; an anti-rheumatic, sulfasalazine; an anti-fungal, Amitra; a monoclonal antibody medication, Repatha; and a type II diabetes medication, Trulicity. (Tr. 1372).

On examination, Ms. Kennedy presented as obese, standing a height of 5'6" tall and weighing 269 pounds. (Tr. 1372). She was hypertensive with blood pressure of 158/76 mmHg (*Id.*). Ms. Kennedy had rhonchi in both lung fields and venous changes in both wrists (*Id.*). There was mild to moderate tenderness in the lumbar spine, and she walked with a mild limp. (*Id.*).

Range of motion in her dorsolumbar spine was to 70/90 degrees with flexion, 20/30 degrees with extension, and 20/30 degrees with lateral flexion bilaterally. (Tr. 1369). Bilateral hip range of motion was to 90/100 degrees with flexion, 30/30 degrees with extension, 30/40 degrees with abduction, 20/20 degrees with adduction, 20/40 degrees with internal rotation, and 40/50 degrees with external rotation (*Id.*). Knee range of motion was to 125/150 degrees with flexion (*Id.*). Ms. Kennedy declined to squat or heel or toe walk. (Tr. 1373). The remaining findings were within normal limits: "[e]xamination of the joints of the extremities revealed no arthritic deformity in any of the joints of the extremities. . . No convincing tenderness to the joints of the

5

extremities." (Tr. 1373). There was no active inflammation or disease activity related to her rheumatoid arthritis (*Id.*). Dr. Onamusi opined Ms. Kennedy was "able to sit frequently, stand or walk occasionally, bend occasionally, squat to a limited extent occasionally with support, climb steps occasionally, lift up to 20 pounds occasionally and use the upper extremity for gross and fine motor task[s] frequently." (Tr. 1374).

At the reconsideration level, State agency consultant David Knierim, M.D., generally affirmed Dr. Hallet's findings, but further found she could never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; frequently handle and finger; and needed to avoid concentrated exposure to pulmonary irritants (fumes odors, dusts, gases, poor ventilation, etc.) and hazards (unprotected heights and heavy machinery). (Tr. 631-32). In reaching his findings, Dr. Knierim considered the examination report and opinion of Dr. Onamusi. (Tr. 621, 629, 631-32).

## IV. ADMINISTRATIVE HEARING

Ms. Kennedy and VE Guy Hostetler testified before the ALJ on January 26, 2021. (Tr. 570).

Ms. Kennedy lives in a house with her husband, who works night shift to pay their bills, and their 32-year-old son; the couple also has a 35-year-old daughter. (Tr. 575-76). Ms. Kennedy has a driver's license but does not drive due to dizziness, so her husband drives her to doctor's appointments. (Tr. 577). She can shower and brush her own teeth and hair. (*Id.*).

She last worked on February 1, 2018. (Tr. 578). She stopped working due to migraines and arthritis, which prevented her from standing, reaching into bottom cupboards, and using a ladder. (*Id.*). She worked third shift at a gas station, requiring her to sweep, mop, clean, and remove snow from the parking lot. (*Id.*). She could not do these tasks anymore due to being out of breath from

6

her COPD and heart condition that progressively got worse. (*Id.*). She has not worked full-time since 2006 or 2007. (Tr. 579).

Ms. Kennedy experiences daily migraines, dizziness, and pain. (Tr. 579). She has a heart condition inhibiting her body from receiving oxygenated blood, arterial septal aneurism plus blockages, Raynaud's, peripheral artery disease, fibromyalgia, stage-two kidney disease, a hiatal hernia, diverticulitis, Duchenne disease, several autoimmune diseases, arthritis, and a back plate. (Tr. 579-80).

She can walk for five minutes before she is out of breath and does not know how many pounds she can lift. (Tr. 582). On a typical day, Ms. Kennedy does laundry, washes dishes, and cooks. (Tr. 583). Her husband sweeps the floors and although she can vacuum, she must pace herself to not get out of breath. (*Id.*). She seldom does the grocery shopping. (*Id.*). She does not spend time with friends or family outside her husband and children. (*Id.*). Her hobby is floral arranging, and while she has a cat, she is not its primary caretaker. (Tr. 584). Ms. Kennedy browses Facebook rarely and plays games on her phone. (Tr. 596). She does not have any problems with drugs or alcohol but smokes a pack and a half of cigarettes a day. (Tr. 584).

Ms. Kennedy cannot perform a job where she is seated sorting nuts and bolts because her legs would hang and swell. (Tr. 585). She can sit or stand for ten minutes before having to move or change positions. (*Id.*). She must elevate her legs to keep the swelling down, and on a typical day elevates them four or five hours. (Tr. 585-86). She gets cramps in both hands every day, which feels like a trigger finger that locks up. (Tr. 587).

Two to three times a week, her headaches are particularly bad and require her to "sleep it off" in order to feel any relief. (Tr. 588). She can hear her own heartbeat in her head, which

"drives [her] crazy." (*Id.*). She takes a nasal spray to try to alleviate the headache, which brings it to a tolerable level. (*Id.*).

VE Hostetler then testified.

**Hypothetical One.** VE Hostetler first assumed a hypothetical individual of Ms. Kennedy's age, education, and work history, limited to light exertion, with the following additional limitations: occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasional stooping, kneeling, and crawling; frequent crouching; frequent handling, fingering, and feeling with the bilateral hands; occasional exposure to concentrated dust, odors, fumes, or other pulmonary irritants and vibrations; limited to simple, routine tasks but not at production rate pace (for example, no assembly line work); and provided a sit/stand option at the workstation to change positions for two minutes at will during the workday while remaining on task 92 percent of the workday. (Tr. 590). VE Hostetler testified the individual would be capable of working as a counter clerk (DOT 249.366-010), cashier (DOT 211.462-012), and blood donor unit assistant (DOT 245.367-014). (Tr. 590-91). All three are light exertion SVP 2. (Tr. 591).

**Hypothetical Two.** VE Hostetler then assumed the same individual from Hypothetical One, limited to the sedentary exertional level. (*Id.*). VE Hostetler identified three SVP 2 sedentary jobs the individual could perform: order clerk, food and beverage (DOT 209.567-014); document preparer, microfilm (DOT 249.587-014); and lens block gauger (DOT 716.687-030). (Tr. 591-92).

VE Hostetler also testified that lying down during the workday is work preclusive. (Tr. 592). Elevating feet above the waist (greater than 12 inches) would also be work preclusive. (*Id.*). If an employee needed to elevate their feet 12 inches or less, the lens block gauger job would no

8

longer be workable, but the order clerk and document preparer could elevate their legs while working. (*Id.*). There would be no other job to replace the lens block gauger job. (*Id.*).

Being off-task 25 percent or more of the workday as well as missing two or more days monthly on a regular or ongoing basis are both work preclusive. (Tr. 593). There would be no competitive work for an individual who is unable to sit, stand, and walk for more than one hour in an eight-hour workday. (Tr. 594).

The ALJ asked Ms. Kennedy if she was at risk due to "poly-pharmacy," or the taking of too many medications at one time, given her thirty active prescriptions. (Tr. 595). Mr. Kennedy explained she was having conversations with one of her doctors about eliminating at least six medications. (Tr. 596).

## THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.  The claimant has not engaged in substantial gainful activity since January 1, 2007, the alleged onset date (20 CFR 404.1571 et seq.).

3.  The claimant has the following severe impairments: obesity; degenerative disc disease of the lumbar spine; chronic venous insufficiency; tobacco abuse; rheumatoid arthritis; polyarticular arthritis; migraines; peripheral sensory neuropathy; fibromyalgia; peripheral artery disease (PAD); chronic obstructive pulmonary disease (COPD); obstructive sleep apnea; trigeminal neuralgia; anxiety; depression; chronic kidney disease stage II; and Type II diabetes mellitus. (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: She can occasionally climb ramps and stairs. She can never climb ladders ropes or scaffolds. She is limited to occasional stooping, kneeling and crawling and frequent crouching. She is limited to frequent handling, fingering and feeling with the bilateral hands. She is limited to occasional exposure to extreme heat and extreme cold. She is limited to no unprotected heights or dangerous heavy machinery. She is limited to occasional exposure to concentrated dust, odors, fumes or other pulmonary irritants and vibrations. She is limited to simple routine tasks but not at a production rate pace for example no assembly line work. She is limited to a sit stand option at the workstation to change positions for two minutes at will during the workday while remaining on task 92% of the workday.

6.   The claimant has no past relevant work (20 CFR 404.1565).

7.   The claimant was born on February 2, 1967 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.   The claimant has at least a high school education (20 CFR 404.1564).

9.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2007, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

12

establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Kennedy asserts one issue for review: the RFC is not supported by substantial evidence because the ALJ failed to consider the supportability and consistency of Dr. Onamusi's opinions. (Pl.'s Br., ECF #6 PageID 2510).

Because Ms. Kennedy filed her application after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. § 404.1520c. Under these revised regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at § 404.1520c(b). The regulations define a medical opinion as "a statement from a medical source about what [the claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 404.1527(a)(1).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D.

Ohio Apr. 8, 2020). In determining the persuasiveness of a medical opinion, the ALJ considers

five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length

of treatment relationship, frequency of examinations, purpose of the treatment relationship, and

examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a

medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The ALJ must articulate the consideration given

to the medical opinions in the record, grounded in the two "most important factors" of

supportability[2] and consistency.[3] 20 C.F.R. § 404.1520c(a). An ALJ must explain how he or she

considered the factors of supportability and consistency, and "may, but [is] not required to"

explain the remaining factors of relationship with the claimant, specialization, or other factors,

absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R.

§§ 416.920c(b)(2)-(3). That said, just because an ALJ does not specifically use the words

"supportability" and "consistency" does not mean the ALJ did not consider those factors. *Hardy v.*

*Comm'r of Soc. Sec.*, No. 2:20-cv-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

The ALJ in this case analyzed Dr. Onamusi's medical source opinion as follows:

Babatunde Onamusi, M.D. performed a physical consultative examination on April 11, 2019. The doctor found by examination that the claimant walked with a slight limp, but her gait was steady and she did not require an assistive device. She had no problems getting on and off the exam table. The claimant's muscle power and tone was normal in all muscle groups tested. Reflexes and sensation was normal. There was no edema in the extremities. Her cranial nerves were intact. Dr. Onamusi found "no convincing tenderness to the joints of the extremities." She had

---

[2]    "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[3]    "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

moderate tenderness of the lumbar spine and decreased range of motion. Range of motion of both hips was slightly diminished and flexion of both knees was reduced. She had normal range of motion of the cervical spine, both shoulders, elbows, wrists, and all fingers. The claimant was able to use her hands for fine coordination and manipulative tasks; fine fingering movements; and grip strength in each hand was 50 pounds. She was also able to reach forward and push/pull with the upper extremities. Based upon his evaluation of the claimant, Dr. Onamusi opined that she could "sit frequently, stand or walk occasionally, bend occasionally, squat to a limited extent occasionally with support, climb steps occasionally, lift up to 20 pounds occasionally and use the upper extremities for gross and fine motor task frequently."

This opinion was somewhat persuasive as it supported that she could perform the lifting requirements for light work, but the opinion was not a function-by-function analysis fully describing her abilities and/or limitations. Dr. Onamusi's finding that the claimant could only walk or stand occasionally was ambiguous as he did not define what he considered as occasional. It was also generally inconsistent with his examination findings as he found she had a steady gait even with a slight limp, she had no difficulty getting on/off the exam table, and she had normal muscle strength. These exam findings were similar to those in the record that found she had normal gait or gait within normal limits and normal muscle strength.

(Tr. 25) (internal citations omitted).

Ms. Kennedy argues the ALJ erred in failing to address the supportability and consistency of Dr. Onamusi's opinion on her range of motion, especially with respect to her upper extremities, and in failing to establish a logical bridge between the evidence and conclusion because she dismissed Dr. Onamusi's walking and standing opinion as ambiguous, but also found it inconsistent with examination findings. (Pl's. Br., ECF #6, PageID 2512-13).

First, Ms. Kennedy argues the ALJ erred by failing to consider the supportability of the opinion because the ALJ did not address Dr. Onamusi's range of motion evaluation in her analysis, but rather focused in on Ms. Kennedy having a steady gait and normal muscle strength. (*Id.*). According to her, "[t]he ALJ did not address the support that Dr. Onamusi used to back up his opinions, and by doing so failed to properly consider the supportability factor." (*Id.*). Ms.

15

Kennedy also argues the ALJ erred in failing to discuss the consistency of Dr. Onamusi's opinion with the remainder of the record evidence. (*Id.* at PageID 2512). Regarding the consistency factor, Ms. Kennedy argues the ALJ cited only to exam findings where Ms. Kennedy was found to have a normal gait and normal muscle strength, and "[t]his one sentence was the extent of the ALJ's analysis for the consistency factor." (*Id.*).

The more relevant the objective medical evidence and supporting explanations presented by Dr. Onamusi to support his opinion, the more persuasive the opinion and finding will be. 20 C.F.R. § 404.1520c(c)(1). The more consistent Dr. Onamusi's opinion is with the evidence from other medical and nonmedical sources, the more persuasive the opinion and findings will be. 20 C.F.R. § 404.1520c(c)(2).

With respect to range of motion, the ALJ cited the following in determining the RFC:

- Ms. Kennedy's examination in November 2007 demonstrating good range of motion of the neck, shoulders, elbow, and fingers with no synovitis (Tr. 19);

- Ms. Kennedy's experiencing no major arthritis flares while taking methotrexate and prednisone as of October 2020 (Tr. 20);

- lack of edema in her extremities and five out of five muscle strength in each muscle group as of July 2019 (Tr. 21);

- normal reflexes (*Id.*);

- normal gait and active range of motion of all extremities in August 2019 (Tr. 22); and,

- normal cervical and thoracic MRIs taken in October 2019 (Tr. 23).

The ALJ also iterated the opinions of Drs. Hallet and Knierim, neither of which imposed more than a frequent limitation on range of motion. (Tr. 24). In analyzing Dr. Riess' opinion, which limited Ms. Kennedy to never using either upper extremity or lifting any amount of weight, the

16

ALJ found the limitations unsupported and inconsistent with her activities of daily living, specifically her ability to do light chores, simple cooking, and flower arranging, in addition to various medical records reporting normal gait and muscle strength in all extremities. (Tr. 26).

Other than the findings on examination that day, Dr. Onamusi did not provide anything by way of support for his limitations. The ALJ stated the limitations went unsupported because "the opinion was not a function-by-function analysis fully describing her abilities and/or limitations." (Tr. 25). Further, the opinion stated she had normal range of motion of the cervical spine, both shoulders, elbows, wrists, and all fingers. (Tr. 25).

It is not necessary for the ALJ to "perform an exhaustive, step-by-step analysis of each factor." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017). Instead, the ALJ need only "provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion.'" *Id.* (quoting *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804-05 (6th Cir. 2011)). Lack of sufficient rationale, internal inconsistency, inconsistency with the evidence of record, and lack of support for many of the proffered limitations are all "good reasons" backed by substantial evidence. *Makela v. Comm'r of Soc. Sec.*, No. 22-1047, 2022 WL 9838285 (6th Cir. Oct. 17, 2022).

Reading the record as a whole, I find substantial evidence supports the ALJ's omission of range of motion limitations in the RFC. While Dr. Onamusi's examination revealed Ms. Kennedy had limited flexion and extension, the remaining evidence the ALJ cited throughout the RFC determination suggests Ms. Kennedy was consistently at full muscle strength without significant range of motion problems in any extremities. Although there is evidence Ms. Kennedy experiences difficulty with range of motion and flexibility based on her assessments in physical therapy sessions

17

(Tr. 1408-23), "when a record presents substantial evidence supporting two contrary conclusions, a reviewing court must affirm the findings of the Commissioner." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 960 (N.D. Ohio Jun. 24, 2003) (citing *Buxton*, 246 F.3d at 772). I do not find any procedural or regulatory error in the ALJ's analysis of the opinion's supportability or consistency, and substantial evidence supports her conclusions. Ms. Kennedy's first argument is not well-taken.

Ms. Kennedy also argues the ALJ erred in finding Dr. Onamusi's opinion concerning her ability to stand or walk was ambiguous, but then immediately finding the opinion to be inconsistent with his exam findings. (Pl.'s Br., ECF #6, PageID 2513). The determination stated:

> Dr. Onamusi's finding that the claimant could only walk or stand occasionally was ambiguous as he did not define what he considered as occasional. It was also generally inconsistent with his examination findings as he found she had a steady gait even with a slight limp, she had no difficulty getting on/off the exam table, and she had normal muscle strength.

(Tr. 25). The Commissioner argues the plain reading of this statement shows (1) the ALJ observed the limitations were vague and undefined and (2) determined any limitation in standing and walking was not supported by or consistent with the evidence. (Comm'r's Br., ECF #7, PageID 2428-29).

I agree with the Commissioner. The ALJ specifically pointed to the ambiguous word "occasionally." Indeed, the ALJ's statement could also be written like this: "any degree of limitation on Ms. Kennedy's ability to walk or stand is inconsistent with the record, but even if evidence supported some kind of limitation, I am unable to determine whether it supports this limitation, because Dr. Onamusi did not define 'occasionally.'" Ms. Kennedy's final argument is not well taken; the ALJ's statement regarding the ambiguous limitation is not confusing nor does it require further explanation to facilitate proper review.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: June 1, 2023

<br>

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** See Fed. R. Civ. P. 72(b)(2); _see also_ 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). **Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** _Berkshire v. Dahl_, 928 F.3d 520, 530 (6th Cir. 2019). **Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** _Howard v. Sec'y of Health and Hum. Servs._, 932 F.2d 505, 509 (6th Cir. 1991). **Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'"** _Overholt v. Green_, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting _Howard_, 932 F.2d at 509). **The failure to assert specific objections may in rare cases be excused in the interest of justice.** _See United States v. Wandahsega_, 924 F.3d 868, 878-79 (6th Cir. 2019).